[No. 28788. Department Two. August 13, 1942.]

CHARLES T. PARKER *et al., Respondents and Cross-appellants,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant.*[1]

[1]Reported in 128 P. (2d) 497.

482

The *Attorney General, Edward S. Franklin,* and *Roy A. Huse, Assistants,* for appellant.

*Robert F. Sandall,* for respondents and cross-appellants.

BEALS, J.—Pursuant to act of Congress passed June 28, 1938, known as the "Mill Creek Flood Control Act," the Federal government let to Charles T. Parker and Carl A. Schram, copartners as Parker-Schram Co., a contract for the construction in Walla Walla county of the works deemed necessary to control flood waters in Mill creek. The cost of the work was approximately nine hundred thousand dollars, depending somewhat upon the amount of material to be used. From the specifications, the work to be performed may be briefly described as follows: The construction of a rolled-fill earth embankment about 145 feet in height and 3,200 feet in length, including foundation excavations and a system of pipe drains, together with outlet construction, including intake power pressure pipe valves and valve houses. A concrete diversion structure was to be built, including two radial gates. A rolled earth diversion dike, a debris barrier across Mill creek, a concrete-lined intake canal, together with headworks and *four radial gates, an outlet canal, two concrete* division structures for apportioning the flow of water

between channels, together with some other construction, were included in the contract.

Messrs. Parker and Schram had performed considerable construction work in the state of Washington, which fell within the scope of the department schedule 1-1, *infra*, and had earned a favorable merit rating in that class by reason of their low accident cost. Prior to entering upon the performance of the contract above referred to, the contractors suggested to the department that the work called for by the contract should properly be classified within schedule 1-1, while the supervisor contended that it should be classified within 7-1, *infra*. As the contractors had performed no work in the state of Washington classified as 7-1, they would, under the rules of the department, be required, for the period of one year, to contribute at the base rate before they could earn a merit rating in that class based upon low accident cost, which would entitle them to a reduced premium rate. From the refusal of the supervisor to classify the work under schedule 1-1, the contractors appealed to the joint board, which affirmed the ruling of the department.

Rem. Rev. Stat., § 7676(a) [P. C. § 3471], sets forth the schedule of employments as classed and subclassed, with rates, as provided by § 7676. Rem. Rev. Stat. (Sup.), § 7676, class 7-1, fixes a rate for "dam construction (includes every operation)," which rate is higher than class 1-1 of the same section, which includes, among many other operations, ditches and canals (not otherwise specified), canals other than irrigation, excavation (N.O.S.), grading (N.O.S.), and diking.

The contractors appealed to the superior court from the ruling of the joint board. After an extensive hearing, the trial court ruled that the department should reclassify by placing in class 1-1, Rem. Rev. Stat. (Sup.), § 7676, all of the work called for by the con-

tract, save the diversion dike and the diversion weir, which the court held were properly placed in class 7-1. From the judgment embodying the court's ruling, the department has appealed, contending that the trial court erred in placing any portion of the work in a class other than 7-1. The plaintiffs have cross-appealed from that portion of the court's judgment which directed the classification of the dike and diversion weir as class 7-1.

Much evidence was taken before the department, that introduced by respondents tending to show that the work called for by the contract should not be classified as dam construction, but rather as a series of dikes, canals, ditches, and control and diversion gates, together with a storage reservoir. Respondents stressed the fact that a great majority of the work was performed on dry land and with the same machinery generally used in highway construction. Respondents and several qualified engineers, testifying on respondents' behalf, stated that, in their opinion as experts, the job properly fell within the statutory classification 1-1.

An expert of many years' experience, testifying for the department, after describing the work, stated that in his opinion the contract called for the construction of a dam, as the entire construction was to be "built throughout for the resistance of a flow of water through it, which is the purpose of the dam."

Based upon the record before us, the joint board decided that, as a portion of the work consisted of a dam across Mill creek, the entire work consisted of dam construction, and should be placed within class 7-1. No additional evidence was taken before the superior court, the cause being submitted upon the record made before the department.

The trial court entered extensive findings of fact, including the following:

"VII. That from the evidence and exhibits on file, the court finds that the defendant was in error in classifying the entire project in classification 7-1; that the total bid price of the project was $905,570.00; that what are designated in the specifications as a diversion dike and diversion weir, the approximate bid price of which two items was $40,000.00, were properly classified in class 7-1 for the reason that their function was to divert the waters of Mill creek; but that no part of the remainder of the said project was in any sense dam construction, is accurately itemized in class 1-1, and should be so classified.

"VIII. That the headworks, intake canal, reservoir, storage dam, outlet canal, division structures and canals were constructed under the most ideal conditions, and entirely removed from any stream or water whatsoever, and were in connection with and incidental to a storage reservoir; that the object of the said reservoir is to temporarily store and hold water diverted from Mill creek, but that this will occur only should the said creek ever again reach a flood stage.

"IX. That what is designated as the reservoir area is a great, natural reservoir; but that in the vicinity of the storage dam there was a low area in the natural terrain; that it was desired to build up this low area to a common level by means of a rolled fill earth embankment, thereby increasing the capacity of the otherwise natural storage reservoir; that this was done by first stripping the topsoil from the low area, digging canals and installing concrete encased drainage pipes; thereafter soil was excavated from the higher terrain at the extremities of the storage dam because of the possibility that this soil might be pervious; that the soil so excavated was redistributed in the low or central area of the storage dam, in layers and tamped down with sheep's foot rollers, and the dirt embankment, or storage dam was then completed by excavating dirt from the storage reservoir area, spreading it in layers along the length of the embankment, and tamping it down as heretofore described. That the removal of the soil from the low area, from the higher terrain at the extremities of the embankment, and from the reservoir area is designated in the specifications as

'Excavation' and was paid for on that basis, namely 14¢ per yard and totaled at $237,000; that for building up the embankment by spreading the excavated soil along the length of the embankment and tamping it down the plaintiffs were paid 3¢ per yard and that this was totaled in the specifications at $53,000. That after an impervious embankment had been so constructed it was faced on both sides with gravel.

"X. That the construction of what is designated in the specifications as a storage dam in no sense con-stituted *dam construction*, but was rather a dike or an embankment of earth to increase the capacity of a great natural reservoir, retain the water therein, and to prevent overflowing of wheat lands beyond the em-bankment."

The conclusions drawn by the court from its findings of fact supported the court's decree above described.

■ There is no serious dispute on any question of fact, the parties differing only as to the proper con-clusions to be drawn therefrom. This being true, the principle that on appeal to the courts the findings and decision of the department shall be deemed *prima facie* correct, is not applicable. *Johnson v. Department of Labor & Industries,* 3 Wn. (2d) 257, 100 P. (2d) 382.

■ In support of their respective contentions, the parties quote different definitions of the word dam, each party quoting some definitions which support the respective contentions.

In Webster's New International Dictionary (2d ed.), 1941, the first definition of the word dam reads as follows:

"A barrier to prevent the flow of water; esp. a bank of earth, or wall of any kind, as of masonry or wood, built across a watercourse, to confine and keep back flowing water."

Certainly the idea of a dam, as the word is used in connection with water, is that it suggests a structure built across a watercourse to form and hold behind

the dam a body of water, the size and volume of the body of water of course varying greatly in different cases. The word has many and various dictionary definitions, but considering the classes of work which we have quoted above from § 7676 (Sup.), it is our opinion that the legislature, in setting up class 7-1, *supra,* had in mind a construction erected across a watercourse to confine and keep back flowing water.

The primary purpose of the Mill creek project was to guard against damage by flood. The construction called for by the contract amounts to a huge reservoir to hold flood waters until they can be safely released into natural watercourses.

In Webster's Dictionary, a dike is defined as "a bank, as of earth, thrown up to form a barrier, line of de-marcation, or the like; esp., an embankment to prevent inundations."

While some of the secondary definitions of the word dam might well be construed as including the project under discussion, we are of the opinion that the trial court correctly construed the language contained in the statutory classifications above referred to.

In deciding such a question as that here presented, it is seldom that judicial decisions are particularly helpful, and none has been called to our attention which is directly in point. The legislative intent must be determined according to the generally accepted un-derstanding of the words used.

If we consider the nature of the work called for by the contract, the conclusion reached by the trial court appears perfectly reasonable. The principal portion of the work was excavation in dry land in the middle of an extensive wheat farming territory, and the piling of the earth excavated in a very large embankment. Excavation is listed in class 1-1, as is the building of a dike. The entire project was designed solely for the

purpose of controlling occasional flood waters, the main portion of the construction being the reservoir for the holding of the water. The reservoir construction included, in addition to the excavation, ditches, pipe laying, and conduits, all of which fall more reasonably within class 1-1 than within class 7-1.

The trial court's findings are clear and comprehensive, and are supported by the record.

Respondents have appealed from that portion of the judgment holding that the diversion dike and weir should be placed in class 7-1. This portion of the operation was in fact a dam, having been designed to regulate the flow of water in Mill creek, and to divert flood waters from the creek to the reservoir.

After careful consideration, we are convinced that the trial court correctly decided the issues presented, and the judgment appealed from is accordingly affirmed.

ROBINSON, C. J., BLAKE, SIMPSON, and JEFFERS, JJ., concur.